Our second case is 24-1447, Maryland Chapter of the Sierra Club v. Federal Highway Administration. Is it Nicely? Nicely. Well done, Your Honor. And for Ready, may it please the Court. Jared Nicely on behalf of Maryland Chapter of the Sierra Club, National Trust for Historic Preservation, and Natural Resources Defense Council, this is a challenge to the unlawful approval of a multi-billion dollar highway expansion and tow lanes project outside of D.C., a project that threatens serious harm to communities, ecosystems, and historic sites along its 15-mile path. Now, when reviewing the project and deciding whether to approve it, the agencies had to comply with all federal laws and to engage in informed and reasoned decision-making, and they did not. In three important respects, the agencies flouted bedrock principles of administrative law, violating NEPA and Section 4F. First, as defined particulate matter, or PM2.5, the agencies failed to consider the most important part of the problem, which was the PM2.5 pollution and impacts from the project itself. This violated NEPA's hard-luck mandate. Second, as to air quality impacts in environmental justice communities, the agencies' central finding of equal impacts ran counter to their own traffic modeling, which showed that the project would shift massive rush-hour traffic bottlenecks into environmental justice communities at the tow lanes endpoint. This also violated NEPA's hard-luck mandate. And third, as to historic Plumbers Island, the agencies failed to comply with binding regulations that required specific seven-factor balancing tests when they decided upon an alignment alternative for the American Legion Bridge that would destroy character-defining features of the Plumbers Island in order to spare other parkland of questionable historic and preservation value. Now, in each of these cases, the agencies skipped key analytic steps, ignored relevant evidence, and disregarded important factors rather than doing the analysis that the law required. And this left both the... Can I ask you on the environmental justice part of this? We got a notification from counsel that one of the recent executive orders affects that issue, at least has rescinded the previous executive orders. What's your position on what effect that has on this case? It has no effect at all on this case, Your Honor, because that executive order had no... We were not suing to enforce the executive order. The executive order, when it existed, said on its face that it didn't create any cause of action. Instead, we were suing, as the agencies recognize in their briefs, under the APA and under NEPA, where other courts of appeals have recognized once you look and start looking at environmental justice issues, you have to comply with NEPA's hard-luck mandate, and you have to make a reasoned decision connecting the facts found to the facts. So it has no relevance to this case and the record for the court. So does that mean... I understand the position that to the extent it's required, you must comply with the process elements to make sure you do it in a way that's not arbitrary and capricious. But isn't there... I'm not suggesting this is the case, but if you assume the requirement to consider environmental justice communities doesn't exist, are you saying that considering it in a way that you don't agree with is still improper? I mean, doesn't taking away the obligation also take away the claim that it was... that this inquiry was arbitrary and capricious? Not at all, Your Honor, because the executive order did not create an obligation that is enforceable in this court to consider environmental justice impacts at all. And that's been recognized by the Ficinos case and the D.C. Circuit as well as the CRC. So where does the obligation come from, you say, from the statute? Well, the obligation comes from NEPA itself and the APA, that once you look at environmental justice impacts, which they did here unquestionably on this record, you have to actually take a hard look at those impacts once you recognize that it's something worth looking at. Does NEPA actually mention environmental justice impacts? The statute itself does not. The current regulations do specifically, in detail, mention environmental justice impacts repeatedly. But the regulations at issue in the time when this project started in 2018 did not specifically mention environmental justice impacts. But the point, for purposes of the record that this court is reviewing, is that they did look at environmental justice impacts and therefore they had to comply with NEPA's hard look standard and the standards for rational decision making under the APA. So let's say this case goes back on remand. I'm not suggesting that it will, but if it does, will that executive order then have some relevance? I think it's speculative to say what relevance it would or would not have. One, if the court says you need to take a harder look at environmental justice impacts, I would hope that the government would do that and not turn its back on the analysis that it did over many years. Second is you have two sets of agencies here. There's the federal government, which has rescinded the executive order, but you also have the state of Maryland. I don't know their position on whether they would want to consider environmental justice impacts as part of this Council, on the PM 2.5 issue, it looks like the primary or the first explanation that relates to, I guess, air quality in both the record of decision and, I think, the final environmental impact study is this Project 2045. And what both of those things say is that study has been done, everything within the study results in no violations, and this project is within the scope of that. It didn't look like you addressed that in your briefs at all. Am I right about that? We did address it, Your Honor, in our reply brief, and I can find the page for you here, but that study, the 2024-2045 study, only addresses one pollutant, ozone. It does not address, and it specifically says, and these conforming determinations specifically say, they don't address PM 2.5, which is, again, the problem here, that no one ever looked at what the project's PM 2.5 impacts would be. They looked at pre-existing regional NAAQS compliance, which we can talk about why that's inadequate, and they looked at the ozone determination in the 2045 study. And then there's this post hoc rationale that they've offered just in litigation, saying, oh, we also looked at carbon monoxide, and you should take that to cover our PM 2.5 obligation. You have some arguments. That's not just in litigation. That's listed in the draft environmental impact study. I mean, that predates the litigation. The carbon monoxide study, yes, Your Honor, predates the litigation, but the suggestion that that carbon monoxide study somehow excused them from analyzing PM 2.5 doesn't appear until the agencies are in litigation. Indeed, in the record, the agencies never say, not even in response to the many, many, many comments that they received saying they needed to specifically look at the project's PM 2.5 impacts, that the carbon monoxide analysis that they were doing was intended to fit that bill. The agencies do say in two spots in the record that carbon monoxide is a proxy for transportation emissions. They provide no citation or source for that, but more importantly, they don't define what the proxy relationship is between carbon monoxide and PM 2.5. A proxy can be one-to-one. It can be one-to-a-million. We don't know. And they make no findings about the PM 2.5 amount of pollution or the impacts from the PM 2.5 that the project would release. I appreciate that argument. You don't think the proxy statement is sufficiently documented, but why isn't that, whether it's, putting aside for the second, whether it's sufficiently explained and documented, why isn't that enough to say, hey, that is a proxy for the issue you're complaining about? And then our inquiry is not whether it's post hoc or not, it's whether it's sufficient in the first place. To actually set up a proxy explanation, you have to actually say more than it's a proxy and move on. You have to define what the proxy relationship is, and that would be our main point there. But even on the merits, it's clear that carbon monoxide is not a one-to-one solution for carbon monoxide. It actually says on page two, don't use this guidance to do PM 2.5 analysis. And that's because carbon monoxide and PM 2.5 are totally different pollutants. They come from different sources, with PM 2.5, more than half of it coming from tire and brake wear, not just the tailpipe emissions where carbon monoxide comes from. And they're subject to different standards, which reflects the fact that PM 2.5 is way more dangerous to public health. So they do say carbon monoxide is a proxy for transportation emissions, as discussed in the 1987 technical advisory. I thought that's where that came from. Now your response is the technical advisory doesn't mention particulate matter because that wasn't a thing then, or wasn't recognized as an air quality problem then. But they do give a reason why it's a proxy, and it seems that Judge Rushing, you acknowledge, it's from 40 years ago, and it was issued before PM 2.5 was even regulated. It doesn't mention PM 2.5, and there's no reason to think that that, to then jump from that conclusion that doing an analysis under that document would somehow satisfy the obligation, the independent obligation they have to take a hard look at the actual PM 2.5 emissions from the project and what it would mean to local communities. When you say that they have an obligation to take a hard look, that certainly is true. So what does that mean? In taking a hard look, they make a conclusion suggesting that carbon monoxide is a sufficient proxy for particulate matter, and it turns out to be, in your view, factually incorrect. You're saying that's not a hard look because it's factually incorrect? Well, one, Your Honor, we disagree with the fact that they made that conclusion. But assuming that they made the conclusion, it's not a hard look because it's factually incorrect. But even assuming that it's a one-to-one analysis and what is true about carbon monoxide is true for PM 2.5, their own carbon monoxide modeling shows that pollution levels are going to double between the project, between the no-build and the build alternatives in 2045. If you double the amount of PM 2.5 pollution you have, you're going to have a NAAQS violation. And that is not a hard look. But more fundamentally, our point is that you have to actually take a hard look at PM 2.5, and they haven't done that because they haven't actually made any attempt to connect the carbon monoxide study to the PM 2.5 to any findings about PM 2.5. And their other excuses are all looking at metrics that don't actually account for the project's PM 2.5 pollution. Now, if they had acknowledged that what you just said is true and accurate, that it would have doubled, but the agencies decided to nonetheless proceed with the project, NEPA wouldn't prevent that, right? NEPA does not prevent any particular substantive outcome, but it does require fully informed analysis, and they would have to acknowledge it doubled, and then also the second part of the hard look inquiry is provide a candid acknowledgment of what that means for public health. So they haven't, for PM 2.5 to be clear, they haven't done any part of the hard look analysis. They haven't taken a thorough investigation to figure out how much PM 2.5 the project would release into your nearby community, and then they haven't candidly acknowledged what that would mean for public health in those nearby communities. But do they, I'm just kind of still trying to explore what this is all, you know, ends up doing. I mean, I take your point that they don't, you know, there's not a whole lot of meat on this particular issue. It seems, though, that almost an understood principle that transportation emissions will improve, you know, with traffic flow improving. There's less overall congestion. There's more, less slowdown, and there's a study that they say shows that carbon monoxide will be improved by this project. You don't agree with that. I get that, but that's what they interpret it to say. And then there's this other study that says that generally air quality, you know, will not result in a violation. I take your point that that's an ozone study. But even, so let's accept that. We got ozone getting, you know, not being, creating violations from this. We got carbon monoxide not having, you know, not being below standards after the project. We got those two things they say have been studied and result in there not being a post-project problem. Are they entitled to say, look, we don't have to go do a separate study on PM 2.5. It may or may not be one-to-one, but directionally it works in the same way. And it would be, you know, it would be just a redundant waste of money to go study something that behaves directionally in the same way as ozone and carbon monoxide. I know I'm saying more than perhaps the record says, but had they said it that way, would we be able to say, hey, that's arbitrary and capricious because you didn't go do a separate study? I think you could, Your Honor, and for two reasons. I want to be brief here because I do want to say something about Plumbers Island, but it's for two reasons. One, we don't know what the baseline levels of PM 2.5 are along the highway. So we don't know what the starting point is and how dangerous it is right now before the project. And two, even if it's directionally similar, the record still shows that the project is going to increase pollution in those neighborhoods compared to not building the project. The discussions about levels going down have nothing to do with the project, and that's compared to the status quo now versus the project in the future. And just on Plumbers Island really briefly, Your Honor, they had three key obligations that they had to comply with. They had to choose the alternative for the American Legion Bridge that would cause the least overall harm in light of Section 4F's preservation purposes. They had to make that decision by balancing seven specific factors, and they had to document that analysis in their final decision. And they simply did not do that when they selected the on-center alignment over the westship alignment for the American Legion Bridge. And the court doesn't need to go any further than the fact that they didn't comply with the binding regulations on how to do a least overall harm analysis to determine that the final conclusion there was unlawful. Do you mind if I follow up with that? I appreciate we've asked your question, so I want to give you a chance to fully explain your issue on the last 4F point. From my review of the record, they have this chart that compares certain options, and I understand the point that that doesn't include the westward-oriented, I think I'm saying it right, the western option. I think their position is that while not in the chart, the information on the westward-oriented portion of the chart is contained elsewhere in the record. If you assume that the information is contained elsewhere in the record, do you agree that would be sufficient, or is it insufficient because it's not put in the formal chart? I think to answer your question directly, I think if all the necessary information were in the record, it wouldn't matter what form that information took. But what they had to do on the regulation was balance the factors, and they didn't even consider the factors. And in fact, they completely ignored the three most significant factors, which are the comparative significance of the properties at issue, the comparative severity of harm from the impacts to the character-defining features of those property, and the ability to mitigate when they didn't even try to fully mitigate the westship alignment. Thank you. Thank you, Mr. Knisely. Good morning. May it please the Court. Andrew Birney for the United States. The District Court correctly granted summary judgment to the agencies. None of plaintiffs' three arguments on appeal have merit or basis for vacating the approval of this important project. I'd like to just start with the PM 2.5 issue. I think we talked a lot about the facts, but I think the legal framework here is important, and I don't think you even get to the CO study or the ozone study. It's important to understand the statutory and regulatory framework under the Clean Air Act, which, unlike NEPA, which is a procedural statute, specifically sets forth agencies' obligations to study pollutants resulting from a project. So the Clean Air Act specifically says you have to study before a federal agency finances or approves a project whether it will lead to or contribute to a tax violation. That's 7506C1B. And then it says, specifically, the 7506C5, that this does not apply to attainment areas. Similarly, the EPA's Clean Air Act regulations say you have to do localized hotspot analysis, that is, more than the area, for PM 2.5, but again, only in non-attainment areas and only for projects that are local air quality concern. This is neither. It's an attainment area, and it's this type of project, as we say in our brief, that EPA has recognized normally doesn't present a local air quality concern. So our central contention in this case is not the CO study, which I'll get to in a minute, but that the agency does not act arbitrary and capriciously in studying the effects of air pollutants on the air when it relies on the exact Clean Air Act regulations and statute that sets forth the substantive requirements for this. And the agency, I think, did say that specifically, I think it's on joint excerpts of records, several places, 779, because the area is an attainment, a specific conformity analysis of PM 2.5 is not required. But that's just the law. Can I stop you there? Yeah. I'm having trouble with the concept that the fact that it's an attainment area before the project starts tells us anything. Because if it was just, you know, woods, undeveloped woodlands, it might look good before the project. It seems to me the whole point is the effect of the project. And so it seems odd to me that you go and say we're in the attainment area pre-project, therefore I don't have to do anything, when it is an attainment area. So I'm going to get to the facts in a second. I just want to say one more time, though, just to fight the question a little bit. The Clean Air Act specifically addresses this and says you don't have to do that kind of analysis in attainment areas. You don't have to consider whether a new project will do that. And that represents Congress's judgment, specific judgment in the context. Just to be clear that we're talking about the same law here, that's to get transportation dollars, right? To get the money that you need to fund this project. The Clean Air Act sets a requirement and they say if you're below a certain amount, cost balancing, it's not worth it to make you test all of this. But we're talking about NEPA, right? This is a challenge under NEPA, which is not at all about the substance, but about investigating the impacts. Right. So, Judge Rushing, respectfully, I don't think the first part of your question was quite right. I mean, the requirement in the statement that you don't have to study in attainment areas applies to any federal action, not just to finance, but also to permit or approve. And our point is compliance with the substantive statute suffices. But let me get to the facts of the case, because I want to get to the court's concern directly. Counsel for the other side says we have no information about the background PM 2.5 levels in this area. Respectfully, that's not correct. If you look at the joint excerpts of record 2068, the agency says the relevant areas are well below PM 2.5 levels. And then there's a table at page 2071 of the excerpts of record that sets forth the levels for Prince George's County, Montgomery County. And what you'll find when you look at that table is they're not even close. The levels are generally between 6 and 10 micrograms per cubic meter compared to a relevant max of 35 grams per cubic meter. So this is not a case where we're right on the edge. And in addition, even though the agency didn't have to do it, we do have the CO proxy study, which I don't think this is a post hoc rationale at all. It's expressly in the record. CO is also an attainment, so when the agency did this study and said it's a proxy for transportation emissions, it meant that it was doing this to sort of dot its T's and cross its I's, even though it didn't have to. What that study showed, to the point, is not just it will not lead to a violation of the CO NAX, but again, it won't even be close. Even applying highly conservative worst case and frankly unrealistic assumptions, and even looking at the worst intersections of the project, the CO levels are going to go down, I think it says on 21-28, from 7.3 to 4.3 for the one hour level, and 4.6 to 2.5 for the eight hour level from 2025 to 2040. Plus we have the ozone study. Can I ask you about that? Because that seems relevant, we should credit the agency's assessment that this can be a proxy. Take me to the next step, so they say this study showed there won't be a violation of the CO NAX, and in fact it will go down. And then the next sentence is, and this is what it means for PM 2.5. So what's that part? The agency did not expressly say that, Judge Rushing, and I think the reason I laid out the legal framework, though. But I'm just asking, is there anything in the record that gives me something to go on for that? We had a discussion about it's feasible that all these emissions directionally go the same way, but I'm trying to understand what can we draw, or what did the agency draw, more importantly, from the carbon monoxide study about other pollution? Sure, so the agency didn't expressly square the circle and say this is what this means for 2.5. And the reason it didn't do that, I think, is because we're in an area where because no conformity analysis for PM 2.5 was required in the first place, the agency was just doing this, was taking an extra step that it wasn't legally required to. So that's why I think it doesn't show that. But I think just on the facts, I think there's no sort of evidence or even plausible theory that PM 2.5 levels for this kind of pollution project, which, again, EPA has said doesn't even present a local air quality concern, are going to go up to quadruple, even as CO levels go down and it doesn't cause a violation of the ozone max, even though ozone is not an attainment for this area. So it sounds like your position there, putting aside the first thing that we don't have to do anything, is we start from a real low place. PM 2.5 is not near any worry zone to begin with. And then we've got two other things that generally would show the effects on air pollutants, and they aren't showing problems, so we're good. I think that's right. You don't really say all that. That's the implication of it all. I think all this additional study that did just confirms there will be no violation. I mean, our first level argument, Judge Quattlebaum, and I appreciate that you're expressing some concern about this, is that categorically compliance with the Clean Air Act, which specifically addresses this issue, is sufficient. Just on the EJ analysis specifically, I think the record is clear that the majority of EJ, the majority of environmental effects, this is on 635 and 36, will fall on non-EJ communities. The agency specifically looked at traffic in EJ communities at 1193, found modeling miles an hour that traffic will generally improve compared to the no-build positions. I also think it's important that there are other positive effects on environmental justice communities. The agency also notes that this is going to relieve congestion on local roads, which will, compared to the no-build alternative, lead to an increase of time for emergency services and for community services. I'm sorry to cut you off there. I'm not uninterested in your substantive answers on that challenge, but I'm curious as to your position on the effect of the recent executive order. Colleagues suggest that it's kind of irrelevant because once you start it, you've got to do it the right way. Do you agree with that, or do you say that the absence of an underlying obligation to look at it kind of voids any question of whether you did it right or wrong? Sure, Judge Quattlebaum. I probably should have started by explaining the letter that I filed. I think our primary reason in filing that letter was just to make the Court aware of it. I do think that once we do agree that what the cases say, that if you do an EJ analysis, which is directed by the executive order, even though it doesn't create any privately enforceable rights, that can be challenged as arbitrary and capricious. I think it's relevant only potentially insofar as if the Court were to vacate the decision here, I think it's clear that in that case, the executive order would not apply to any new decision. I think the Court shouldn't take that step. Just actually one point on that, just to take a step back, this was a massive project. It involved coordination with dozens of state and federal agencies, a draft EIS, a supplemental EIS, 16 public workshops, seven public meetings, hundreds of meetings, and they really only challenge a small slice of it. On Summers Island, the affected area is only four hundredths of an acre, so for the reasons we set forth in our brief, we don't think the agency did anything wrong here. But even if the Court were to perceive some defect in what we did, that sounds in failure to explain, and I think it would be very easy to address any problems on remand. So at the very least, we think that vacature of, again, we don't think there's any error in the first place, but at the very least, we think that vacature of this very large and important agency approval would be vastly disproportionate to the scope of their challenge and the ease with which the agency could likely address any problems on remand. What would be the disruptive impact of vacature? The Allied Signal test talks about what you're talking about, whether it's a small problem that could potentially be remedied, with just more explanation or some more testing, if we think the agency might be able to reach the same result. But then there's a second part of that test about the disruptive impact that vacature would have. Yeah, well, which Allied Signal, which I understand this Court hasn't formally adopted, I think is primarily concerned with the seriousness of the area. In terms of prejudice, Judge Rushing, I don't think in terms of environmental, I don't think this project is particularly close to breaking ground. I think mainly the prejudice and the disruption would be, compared to the very limited scope, I think it would be very easy for the agency to fill any gaps, whether it's the regulatory framework on Plumbers Island or the PM 2.5 conclusion. I think the disruption would be this massive process, which required four years of environmental review, hundreds of meetings, undoing all of that for some very modest, again, we think there's... Counsel, again, I think I understand where you're going with that answer. But, I mean, couldn't an order, this is hypothetically, I'm not sure what we're going to do, but if we were to say there was inadequate explanation, why couldn't set aside be the remedy with an opinion that explains what the deficiencies are, and those are cured by whatever explanatory reasons that can be given? In other words, I mean, we could do that without saying everything else was invalid, couldn't we? Well, sure. So, I mean, I understand over time, but I want to respond specifically to this remedial question. So if you remand for additional analysis, let's just say on the PM 2.5 level, I don't want to repeat myself, we don't think that's necessary, but say you remand for analysis, we could do that analysis, and that analysis could easily be done, I think, before any ground is broken on this project, I think it would be quite straightforward. But if you remanded, but also vacated the decision, we could borrow some of the work that we did, but we would have to issue a new decision on all of this. That's why I don't think any court has held that it lacks the power to remand without vacature, and why the D.C. Circuit in particular has said when something like this can be, when it's very likely the agency could reach the same conclusion on remand, which we think is the case here, remand to address a specific issue, rather than the very blunt remedy of vacature of an entire sprawling project, is a preferred remedy. And I see I'm over my time. So if there are no more questions, we'd ask this Court to affirm. Thank you, Mr. Bernie. Mr. Johnson. Thank you. Thank you, may it please the Court, Jay Johnson for the State Appellees. I'd like to start with taking a slight step back and addressing a question that Chief Judge Diaz asked to the appellants, which is what does it mean to take a hard look under NEPA? And it can't mean could the agency have done more, because the answer to that question is always going to be yes. What this Court's case to say is that a hard look requires a pragmatic judgment that takes a holistic view of what the agency did, examining all components of the analysis to determine on the whole whether the agency took a hard look. That's from the Webster case. It's cited in all the briefs. When this pragmatic judgment is being made, it has to be kept in mind that there's a great deal of deference to the agency's technical expertise. That's in numerous cases, you know, not least Supreme Court cases like Baltimore Gas and Electric and Marsh. What does that mean for the questions that were being asked here? I think to start with, there is no requirement that the agency specifically disclose or study or do a very expensive air study exactly how much fine particulate matter, PM2.5, is going to be released by this project. What the agency did was a series of things. They looked at compliance with EPA's standards, which are protective of public health. They looked at a carbon monoxide study, which the agency has clearly stated a proxy using their expertise, a proxy for air emissions. So can I stop you there, Mr. Johnson? Of course. They're saying that without anything more is enough. We accept that at face value. I'm sorry, say that again, Your Honor. So they're saying that carbon monoxide is a proxy for PM2.5. A simple statement like that without anything more indicating, for example, whether there's a one-to-one relationship or something else, is that enough is what I'm asking? I think it's enough for what the word proxy means. It means they're parallel to each other. I don't think that the agency is obligated to make a detailed explanation of exactly how they're related because it says this is a proxy for air emissions from vehicles, and that's exactly what the question to PM2.5 is. I'm just trying to play that out a little bit. What if the carbon monoxide showed you would be above regulatory requirements and you said, yeah, we think they're inversely related, but didn't put a study? If the carbon monoxide study said, oh, you're going to breach requirements, and we said they're a proxy but they're inversely related, I think that might require a little bit more explanation. So you only get to – that's kind of our point. It sounds like you need more explanation. You don't need it if it helps you. You acknowledge you need it if it hurts you. But I think there's more in the record holistically considered, which is that the agencies say, look, this area is an attainment area for PM2.5. It does have, I think, appellant's counsel said, you know, we don't know how much PM2.5 is in the area now, and the Justice Department's counsel pointed out, yeah, on Joint Appendix 2071, there's the current levels right now. They're all below the next. I think it goes beyond that. The Clean Air Act is such a comprehensive statute, you can go onto EPA's website, airnow.com, and literally look at hour by hour levels of PM2.5 everywhere in the country. So it is being thoroughly monitored. And the reason the carbon monoxide study is important is, as the Court has mentioned, directionally there is a parallel. The carbon monoxide from the baseline to 2040, where the study ends, is halved. And that's because EPA, again, is regulating emissions from vehicles, and as those vehicles become newer models, the overall amount of emissions in the air from vehicles is going to decline, whether it's carbon monoxide, PM2.5, or anything else. So let me just follow up with that. So if the agency, as your colleague on the other side alleges, says that this is a carbon monoxide is a sufficient proxy for PM2.5, see 1987 guidance. And it turns out that the guidance says nothing about whether or not carbon monoxide is a proxy for PM2.5. Is that an arbitrary and capricious conclusion? I wouldn't think so, because the guidance says that it's a proxy for air emissions. We're talking about what comes out of the tailpipe of a vehicle. So, you know, as long as the thing that's in question here, PM2.5, is coming out of the tailpipe of the vehicle, there's a proxy relationship. And I think it's fair to say that maybe I don't understand the meaning of the word proxy well enough, but it seems to me that when you're saying proxy, you're saying it's not an inverse relationship, it's a direct relationship. And so, again, thinking about the expertise that not only the Federal Highway Administration and the Maryland Department of Transportation have, but the Environmental Protection Agency, all these agencies are on the same page here saying there's not going to be a problem with PM2.5 from this project. I wanted to address a couple of other points. Council for Appellants suggested that the carbon monoxide study shows that the levels are going to double, but I think that's a comparison of the no-build. Actually, you know, how many cars would be on the road in 2040 without the project versus how many would be with the project. The right comparison, it seems to me, is the baseline of carbon monoxide, which is, you know, going to be half as much when you get to 2040. I'm not sure why it would matter the difference between the no-build and the build, but it certainly doesn't suggest that there would be a violation of any fine particulate matter standards. On the question, I guess I'll, if the Court has more questions about fine particulates, I'll happily address them. But I wanted to talk briefly about the chart for Section 4F. I think it was Judge Quattlebaum who was asking about that. There is a chart in the record. It's on page 1532. That's the mitigation report in the final EIS. That chart does show the west shift that appellants are concerned about compared to the proposed alignment, and it shows that the total acres to park are 5.8 with the west shift and .9 with the proposed. Seventy-five more trees are going to be cut down with the west shift. A thousand more feet of streams are going to be filled in. And I think most importantly, it shows that the acreage of impact to Plumbers Island, it says elsewhere in the record less than .1 acres. This chart shows specifically it's .004 acres. That's 174 square feet. It's like the size of an average kitchen. So it's completely within the realm of reason for the agency to say, looking at all these things together, factoring in that the National Park Service, which owns all this property, said, we want the least overall acreage, that the agency could conclude that Section 4F was satisfied. Before you sit down, I wanted to get Marilyn's position on the environmental justice communities question, because I realize you're not bound by an executive order, and the state may have different interests. That's right. Marilyn's not, as far as I know, bound by the executive order that President Trump issued. Marilyn's view is that if the executive order requiring environmental justice can be withdrawn, but Marilyn is committed to environmental justice and would have done all this same work, regardless of whether there was an environmental justice executive order or not. As the other side pointed out, there was years of analysis, outreach to communities. That's very important to the state, and they would do that regardless of the order. So if hypothetically our court sent this back, Marilyn would continue to study and want to justify the impact on environmental justice communities? Yeah. I mean, maybe the legal framework overall would be different, since NEPA does apply to this project, but I'm just saying as a commitment, the state is committed to environmental justice. Thank you. Can I ask one more follow-up? Of course. Right before Judge Reston's question, you said something to the effect, if I heard you right, that the National Park Service favored the option that had the least acreage affected? That's right. Is that in the record? It probably is. Do you have a JA site to that comment? I don't know if I have a specific JA site to that comment. It is in the record, and I can tell you that Appendix B, I think, to the record of decision, is the letter from the Department of Interior saying, hey, we like this. To make sure I understand, you don't off the top of your head have the site, but you think it's in there? I do. I don't have it off the top of my head, but I do think it's in the record. I appreciate it. Thank you very much. There are no further questions. Thank you. Just a few points in rebuttal, Your Honors. First is the Maryland Council's reference to the framework for how the court should be thinking about this. We agree with everything they've said about deference and how you take a holistic look, but it's important to recognize what this court has said about what that means, and that is that NEPA requires the court itself to take a hard look at what the agency has done and that taking a holistic approach just means you review the deficiencies of one part of the record in light of whether they're made up for elsewhere in the record, and that's what's missing here, especially as to PM 2.5, where there's nowhere in the record where the agencies have actually addressed how much PM 2.5 pollution the project would cause or what it would mean for communities. I want to just briefly clarify the reference to we don't know the PM 2.5 levels right now, and that's because the levels that are referenced by the defendants here, by the agencies, are levels from miles away from the highways, and those levels just do not reflect what's going on by the highways because those levels don't reflect the transportation emissions that those highways are currently dumping into nearby communities, and there's a 2015 study in the record that's specifically found on another part of the beltway that was part of the original plan for the expansion that existing levels were already exceeding the NACs by the beltway, and that's what we mean when we say we don't actually know what the baseline level in these communities would be, much less what would be added to that. So I understand that point, and you're saying that there likely is a significant disparity between those levels, or do we know that for a fact? Based on what we think in the record, we think there's definitely a disparity between what's going on three miles from the highway in a park where they're measuring this right now, and what's going on near the highways where the impacts are going to be felt, and that difference will be even greater when the project is built. That we can say for a fact. What that difference is, we don't know because it's the agency's obligation to assess that and actually answer the question in the first instance under NEPA. I'm going to turn now briefly to Black to Plumbers Island, and just to drill down a little bit on this focus on acreage, which the agencies do focus on, and I'm glad they brought up that specific table that showed the acreage breakdown. And the problem here is that the focus on the acreage impacts are both misleading and a microcosm of a broader error. They're misleading because it captures that statistic. They cite only the footprint of the pilings that are going to be driven directly into the island. It doesn't capture the fact that a 16-lane bridge is going to be overshadowing and hanging over much of the island for many parts of the day, destroying character-defining features including the island's wild landscape and research plots that have been going on there for decades. There's already a bridge there. I was interested in your arguments about the shadowing effect. Are you saying that the change in the bridge after this project is going to substantially affect that shadowing effect? It would, Your Honor, and the shadowing effect, to the extent it exists now at all, is primarily on the very tip of the island and not where the research plots are. So it would cast a significantly larger shadow. And in other parts of the record, the agencies recognize that shadowing is a permanent impact, but not for purposes of the table. And that's part of the problem here is that this focus on acreage turns away from the factors that they're supposed to be looking at, which is the comparative significance of the site. Is the island more significant than land that's already abutting roadways on the other side of the river? The comparative significance of the harm to the sites, and also the ability to mitigate, which there's no evidence they tried to mitigate the West Shift Alignment's impacts on that other land. I see I'm over time. Are there any questions about remedy? Can I ask you about, and again, I have no idea where this case is going to land, but if the panel were to conclude that some kind of additional work would be necessary by the agencies, what's your position on whether or not, as Mr. Birney indicated, that a vacatur should only be a remand to clean up whatever shortcomings you've identified in this case? Our position is that the court should apply the default remedy of vacatur that they always apply. As you heard, there's no real disruption from vacatur in this case, and I respectfully disagree to some extent with the suggestion that if you did vacate on three grounds, which we hope you do, that this would require them to open up everything that they've ever done and redo the process. That's just not how these processes work. They would have to issue a new supplemental environmental impact statement, but it could be targeted to the issues that the court raised and took issue with and to anything else that they think may have changed and they may like to update, including the fact that the max for PM2.5 is now 9 micrograms per meter cubed instead of 12 micrograms per meter cubed, which it was when the decision was made. But they would also have to issue a new rod, but the importance is NEPA and Section 4F are about informed decision making and making sure when you make the final decision of this is the project we want to take on, that you have all the information necessary to do that. They didn't when they made the decision in 2022, and they could if this court vacated to require them to do the missing analysis here. Thank you very much. Thank you, Your Honor. Thank you, counsel, for your fine arguments this morning. We're going to come down and greet you and then take a short recess before moving on to our last two cases. This honorable court will take a brief recess.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., Allison J. Rushing